IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | | |
|---|---|---|
| Gregory Leon Hammer, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14cv8 (JCC/MSN) |
| | ) | |
| J. Keeling, et al., | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

Gregory Leon Hammer, a Virginia inmate proceeding pro se, has filed a civil rights action

pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights and rights under the

Religious Land Use and Institutionalized Persons Act ("RLUIPA") were violated when he was

removed from the Common Fare diet for a temporary period after he violated prison rules. The

matter is now before the Court on defendants' Motion for Summary Judgment, filed on July 31,

2014. Defendants simultaneously filed a supporting memorandum of law with exhibits, and

provided plaintiff with the notice required by Local Civil Rule 7(K) and Roseboro v. Garrison,

528 F.2d 309 (4th Cir. 1975). On September 18, 2014, plaintiff responded by filing a Motion

Opposing Defendants Motion for Summary Judgment, accompanied by a supporting

memorandum. Dkt. 40-41. After careful consideration, defendants' Motion for Summary

Judgment will be granted, and judgment will be entered in their favor.

**I. Background**

The Common Fare Diet was developed by the Virginia Department of Corrections

("VDOC") to meet the religious dietary needs of many faiths. See Acoolla v. Angelone, 2006

1

WL 2548207 at *3 (W.D. Va. Sept. 1, 2006). It is only offered at select VDOC facilities.

Because it is "much more expensive" than normal prison fare, an inmate must apply to receive it.

An institutional committee reviews the application, gathers facts about the inmate's religious

practices, and approves or denies the request. The decision is then reviewed by a Common Fare

Diet committee in Richmond. Id. An inmate's application is approved only if the committee is

satisfied that he is a sincere adherent of a religion that requires the elements of the Common Fare

Diet. Id. The inmate also must sign a participation agreement prior to beginning the Common

Fare program. Keeling Aff. ¶ 5. The Common Fare Agreement states in relevant part:

> As a participant in the Common Fare program, I agree to abide by all
> requirements of this program. The following violations of the
> Common Fare Program will result in action by the Facility Unit Head
> and/or the Institutional Classification Authority and Central
> Classification Services and may be grounds for transfer from my
> current facility assignment:
>
> 1.    I fail to pick up a minimum of seventy-five percent of
> meals served per month ....
>
> 2.    I am observed eating, trading or possessing
> unauthorized food items from the main line.
>
> 3.    I am observed giving away or trading a Common Fare
> food item.
>
> 4.    I have purchased or I have been observed eating food
> items from the Commissary inconsistent with the
> dietary requirements of the Common Fare program.
>
> 5.    I have not attended services or other religious
> activities at least twice per month, if available.
>
> Violation of the Common Fare program will result in the following
> sanctions:
>
> First Offense    Removal from Common Fare for 6 month

2

| Second Offense | Removal from Common Fare for 1 year |
| Third Offense | Removal from Common Fare for 4 years |

Keeling Aff., Enc. C.

The following material facts relevant to this case are uncontroverted.  On September 29, 2013, plaintiff was  confined at the Indian Creek Correctional Center ("ICCC").  Plaintiff is an adherent of Judaism, and was assigned to receive the Common Fare Diet.   As plaintiff exited the dining hall he was searched by a corrections officer, and was found to have concealed a bell pepper in the front of his pants. Keeling Aff. ¶ 8, Enc. E-F.[2]  As a result of this incident, plaintiff appeared before the Institutional Classification Authority ("ICA") on October 10, 2013, to determine whether he should be temporarily removed from the Common Fare Diet.  Keeling Aff. ¶ 9, Enc. F.  Plaintiff argued at the hearing that he could not legally be removed from the Common Fare diet because his actions did not violate the Common Fare Agreement.  Keeling Aff., Enc. F. After consideration, the ICA recommended that plaintiff be removed from the Common Fare program for a period of six (6) months. Keeling Aff. ¶ 9, Enc. F.  The ICA's recommendation was approved on October 11, 2013, and plaintiff was suspended from Common Fare for six (6) months. Id.

Plaintiff filed a Regular Grievance concerning his removal from the Common Fare program on October 6, 2013.  In it, he protested that his suspension was arbitrary because the Common Fare Agreement  "... states that an offender can be removed or suspended from the Common Fare diet if he is observed eating, trading, or possessing found from the MAIN LINE.

---

[2]In fact, plaintiff was one of ten (10) Common Fare offenders found to be in possession of contraband food items during the same shakedown. Keeling Aff., Enc. E.

3

Clearly, peppers are not from the main line. Furthermore there is no rule in the Common Fare agreement that states I will be suspended from the Common Fare diet if I am found in possession of the Common Fare food outside of the dining hall. I have not violated the Common Fare agreement!" Keeling Aff., Enc. G.   Plaintiff argued that his suspension pursuant to what he termed an "unforeseen rule" violated his right to due process because he had no notice that being in possession of Common Fare food outside the dining hall would result in his suspension from the program, and he also contended that his rights under the First Amendment and RLUIPA were compromised. He suggested that "the appropriate remedy for the incident should have resulted in a disciplinary charge for the possession of contraband." Id.

On November 14, 2013, the Warden of ICCC found plaintiff's grievance to be unfounded pursuant to Operating Procedure 841.3, Offender Religious Programs, which states that "offenders will be suspended/removed from Common Fare for violating any of the criteria of the Common Fare Agreement 841-F8." Among those criteria is the rule that the offender is subject to suspension if he "is detected or observed eating, trading or possessing unauthorized food items from the main line." Keeling Aff., Enc. G. In response to plaintiff's Level II grievance, defendant Wendy Hobbs upheld the determination that plaintiff's grievance was unfounded. Keeling Aff., Enc. G.

After  plaintiff's six-month suspension from the Common Fare Diet was completed, he was reassigned to the program. Keeling Aff. ¶ 9, Enc. F.

Plaintiff alleges here that his removal from the Common Fare Diet violated his rights under the First and Fourteenth Amendments and RLUIPA.  The named defendants are J. Keeling, the Warden of ICCC; Wendy Hobbs, a Regional Administrator of VDOC's Eastern Region; and

4

M. Meyer, a prison counselor at ICCC who participated in the ICA hearing.[3]  As relief, plaintiff

seeks an award of compensatory and punitive damages.

## II.  Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that judgment on

the pleadings is appropriate.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (moving

party bears the burden of persuasion on all relevant issues).  To meet that burden, the moving

party must demonstrate that no genuine issues of material fact are present for resolution.  Id. at

322.  Once a moving party has met its burden to show that it is entitled to judgment as a matter of

law, the burden then shifts to the non-moving party to point out the specific facts which create

disputed factual issues.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita

Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  In evaluating a motion

for summary judgment, a district court should consider the evidence in the light most favorable

to the non-moving party and draw all reasonable inferences from those facts in favor of that

party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  Those facts which the moving

party bears the burden of proving are facts which are material.  " [T]he substantive law will

identify which facts are material.  Only disputes over facts which might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment."  Anderson,

---

[3]Both the due process claim and defendant Meyer were added to the lawsuit in the
amended complaint filed on February 10, 2014.  Dkt. 10.

477 U.S. at 248. An issue of material fact is genuine when, "the evidence ... create[s] [a] fair

doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp.,

759 F.2d 355, 364 (4th Cir. 1985). Thus, summary judgment is appropriate only where no

material facts are genuinely disputed and the evidence as a whole could not lead a rational fact

finder to rule for the non-moving party. Matsushita, 475 U.S. at 587.

### III. Analysis

It is well established that a prisoner, although incarcerated, still "retains those First

Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate

penological objectives of the corrections system rights that are not inconsistent with his status as

a prisoner or with the legitimate penological objectives of the corrections system." Pell v.

Procunier, 417 U.S. 817, 822 (1974). To merit protection under RLUIPA and the Free Exercise

Clause of the First Amendment, a plaintiff must satisfy two threshold criteria. First, plaintiff

must allege that his belief or beliefs are sincerely held. Wisconsin v. Yoder, 406 U.S. 205, 215-

16 (1972). Second, plaintiff also must demonstrate that his claim is rooted in "religious" and not

"purely secular" philosophical concerns. Id.; see Thomas v. Review Bd. of Indiana Employment

Security Div., 450 U.S. 707, 713-14 (1981) ("Only beliefs rooted in religion are protected by the

Free Exercise Clause, which by its terms, gives special protection to the exercise of religion.").

However, inmates' constitutional rights must be evaluated with the context of their

incarceration. The Supreme Court has long recognized that "courts are ill equipped to deal with

the increasingly urgent problems of prison administration." Procunier v. Martinez, 416 U.S. 396,

405 (1974). "Running a prison is an inordinately difficult undertaking," and courts acknowledge

that the task of doing so is "peculiarly within the province of the legislative and executive

branches of government." Turner v. Safley, 482 U.S. 78, 84 -85 (1987). Therefore, "courts must

accord deference to the officials who run a prison, overseeing and coordinating its many aspects,

including security, discipline, and general administration." Lovelace v. Lee, 472 F.3d 174, 200

(4th Cir.2006). The actions, even religiously motivated actions, of all citizens remain subject to

regulation by the state government under its power to promote the health, safety, and general

welfare of its citizens, so long as those regulations do not unduly burden the free exercise of

religion, Yoder, 406 U.S. at 220, and a prisoner's federal constitutional rights, including his

sincere desire to practice a religion, may be burdened upon a showing that the restriction is

reasonably related to legitimate penological interests. O'Lone v. Estate of Shabazz, 482 U.S. 342,

349 (1987) (citing Turner, 482 U.S. at 89).  In making such a determination, courts must

consider:

> (1) whether there is a 'valid, rational connection' between the prison
> regulation or action and the interest asserted by the government, or
> whether this interest is 'so remote as to render the policy arbitrary or
> irrational'; (2) whether 'alternative means of exercising the right ...
> remain open to prison inmates,' an inquiry that asks broadly whether
> inmates were deprived of all forms of religious exercise or whether
> they were able to participate in other observances of their faith; (3)
> what impact the desired accommodation would have on security staff,
> inmates, and the allocation of prison resources; and (4) whether there
> exist any 'obvious easy alternatives' to the challenged regulation or
> action, which may suggest that it is 'not reasonable, but is [instead]
> an exaggerated response to prison concerns.'

Lovelace, 472 F.3d at 200 (quoting Turner, 482 U.S. at 89 - 92 (internal quotation marks and

citations omitted)). In applying these factors, a court must "respect the determinations of prison

officials." United States v. Stotts, 925 F.2d 83, 86 (4th Cir. 1991).  In this case, application of

these criteria to the uncontroverted facts before the Court compels the conclusion that defendants

are entitled to summary judgment on plaintiff's claims.

A. Defendants Cannot be Liable in Their Official Capacities

In the amended complaint, which is the operative complaint in this case, plaintiff states that he wishes to sue the defendants in both their individual and official capacities. Am. Compl. ¶ 6. However, claims for monetary damages against state officials are not cognizable under § 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989). Therefore, defendants are entitled to summary judgment on plaintiff's claims against them in their official capacities.

B. Plaintiff is Not Entitled to Relief Under RLUIPA

Under RLUIPA, the government is prohibited from acting in ways that impose a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that the imposition of that burden furthers a "compelling governmental interest" by the least restrictive means. 42 U.S.C. § 2000cc-1(a)(1)-(2). Although RLUIPA does not define the term "substantial burden," the United States Court of Appeals for the Fourth Circuit has held that, under RLUIPA, a "substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" Lovelace, 472 F.3d at 187 (quoting Thomas v. Review Bd. of Indiana Employment Security Div., 450 U.S. 707, 718 (1981)). "On the opposite end of the spectrum ... a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed." Adkins v. Kaspar, 393 F.3d 559, 570 (5th Cir. 2004). "Religious exercise" in this context includes "any exercise of religion, whether or not compelled by, or central to, a

8

system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

A plaintiff asserting a claim under RLUIPA bears the initial burden of showing by a preponderance of the evidence that: (1) he or she seeks to engage in an exercise of religion; and (2) the challenged practice substantially burdens that exercise. 42 U.S.C. § 2000cc-2(b). Once the plaintiff establishes a *prima facie* case, the burden of persuasion shifts to the defendants to show that their practice is the least restrictive means of furthering a compelling government interest. Lovelace, 472 F.3d at 185 (citing 42 U.S.C. § 2000cc-1(a)). See Cutter v. Wilkinson, 544 U.S. 709, 723 (2005).

Pursuant to the foregoing authorities, the starting point for analysis of a claim of denial of free exercise under either the First Amendment or RLUIPA is the determination of whether the plaintiff actually seeks to engage in an exercise of sincerely-held religious beliefs. The threshold requirement is satisfied in this case, as plaintiff states, and defendants do not dispute,  that plaintiff is a sincere adherent of the Jewish faith. Yoder, 406 U.S. at 215 - 16.[4]

Plaintiff's second burden is to establish that his six-month suspension from the Common Fare program substantially burdened his exercise of his religion. RLUIPA itself does not define the term "substantial burden." See Couch v. Jabe, 679 F.3d 197, 200 (4th Cir. 2012). The Fourth

---

[4]While defendants do not contest that plaintiff practices Judaism, they do question whether the sincerity of his beliefs extends to that faith's dietary requirements that food must be carefully prepared, served and stored, since the bell pepper found on his person when he left the lunch room was hidden in the front of his pants. Def. Memo. at 7-8 ("[Plaintiff's] actions in smuggling this food inside of his pants would appear to be quite at odds with a sincere belief in the necessity of eating clean foods.") Plaintiff responds that there was no violation of Jewish dietary laws because the pepper was "wrapped in a clean plastic baggie tucked under the fold of his front beltline." Plf. Memo. at 6.  As plaintiff's rights under the First Amendment and RLUIPA were not violated even if it is assumed that his religious beliefs are sincerely held, the Court finds it unnecessary to resolve this non-dispositive issue.

Circuit Court of Appeals has found that a substantial burden "is one that put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of h[is] religion ... on the other hand." Id. at 200, quoting Lovelace, 472 F.3d at 187. To satisfy this test, a plaintiff "is not required ... to prove that the exercise at issue is required by or essential to his religion." Krieger v. Brown, 2012 WL 5447889 at *3 (4th Cir. Nov. 8, 2012). However, "at a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious observance ... was more than an inconvenience to one's religious practice." Smith v. Allen, 502 F.3d 1255, 1278 (11th Cir. 2007); see Krieger, 2012 WL 5447889 at *4-5 (affirming grant of summary judgment where inmate adherent of the Asatru faith failed to "show that deprivation of an outdoor worship circle and the requested sacred items violated his religious beliefs."). In conducting the substantial burden inquiry, a court properly may consider whether the inmate retains other means for engaging in a particular religious activity in assessing whether a denial of his preferred method imposes a substantial burden. Id.

Here, defendants point out that plaintiff's suspension from the Common Fare Program did not compel him to eat non-Kosher food from the main line. Defendants state, and plaintiff does not dispute, that the prison commissary offers many Kosher foods that prisoners can purchase which remained available to plaintiff during his suspension from the Common Fare program. Def. Memo. at 8. Plaintiff argues in rebuttal that his financial situation made this option untenable. Plf. Memo. at 10. However, the fact that Kosher food remained available to plaintiff, albeit at a cost, appears to negate any claim that plaintiff's temporary removal from Common Fare

10

constituted a substantial burden on his religious practice, since he retained another means for observing his religious dietary laws, <u>Krieger</u>, 2012 WL 5447889 at *4-5, and because it merely prevented him from enjoying the benefit of institutionally-prepared Kosher meals that are not otherwise generally available. <u>Adkins</u>, 393 F.3d at 570.

Moreover, even if it is assumed that plaintiff's six-month suspension from Common Fare did substantially burden his religious exercise, his RLUIPA claim still fails because the regulation at issue plainly furthers a compelling government interest. As discussed above, it is "much more expensive" for VDOC to provide an inmate with the Common Fare diet than with ordinary prison fare. <u>Acoolla</u>, 2006 WL 2548207 at *3. Because the program is designed to accommodate the dietary restrictions of many religions, it is highly regulated, and menu alterations at the facility level generally are prohibited. Keeling Aff., Enc. B. Food served to Common Fare inmates must be stored in separate areas, must be heated in specified ways, and cannot be reheated. <u>Id.</u> Aside from fresh fruits and vegetables, the food is certified by a recognized Orthodox standard. All kitchen equipment is cleaned and handled in accordance with strict guidelines, and food workers cannot handle Common Fare and non-Common Fare foods at the same time. <u>Id.</u> Only designated serving trays may be used to serve Common Fare meals, and the trays are covered and placed in either a hot unit or a refrigerated to ensure a constant temperature. <u>Id.</u> Given the fact that the Common Fare meals are so carefully prepared, stored and served to accommodate inmates who have shown sincere religious beliefs that require such a diet, the need to insure that Common Fare food items remain available solely to those inmates and not to the prison population at large plainly constitutes a compelling government interest.

In addition, the Court credits defendants' argument that the policy at issue is the least

11

restrictive means of furthering that compelling government interest. To show that a policy is the "least restrictive means" of furthering a compelling government interest, prison officials must demonstrate that they have "consider[ed] and reject[ed]" less restrictive alternatives to the challenged practice. <u>Couch</u>, 679 F.3d at 203. When prison administrators explain their challenged policies a court must give deference to those explanations. <u>See</u> <u>Lovelace</u>, 472 F.3d at 182 ("We confirm emphatically that any substantive explanation offered by the prison must be viewed with due deference."). As defendants explain, religious dietary restrictions cannot be met by simply offering religiously-compliant meals on the regular food line, since religious food restrictions generally require separation of compliant foods from non-compliant ones. In addition, since the requirement of separation extends to the preparation and storage of the food, inmates could not be assured of the compliance of Common Fare meals if meals were not served on separate, dedicated trays. As defendants argue, "food is either compliant (and therefore Common Fare) or not, so there is no middle ground between the two diets." Def. Mem. at 13.

In order to ensure the strict compliance necessary for the production of Common Fare meals, VDOC must provide consequences to be imposed if an inmate breaks the rules pertaining to the Common Fare diet. It has done so by creating a graduated scale of punishment to be imposed in such instances, with the first and least onerous being the six-month suspension that plaintiff received. Keeling Aff. ¶6. These consequences are designed to further VDOC's responsibilities to maintain good order, security and discipline in a manner consistent with the demands of minimizing costs due to limited resources. Keeling Aff. ¶ 14. Moreover, as defendants note, punitive suspension from the Common Fare diet does not restrict the inmate's practice of his religion in any other manner, and he remains free to attend prayer services, pray,

12

study religious texts, and possess articles of religious property. Id. Here, then, plaintiff's

RLUIPA claim fails both because he has not shown that the policy at issue places a substantial

burden on his ability to exercise his religion, and because defendants have demonstrated that the

policy is the least restrictive means of furthering compelling government interests.

In response to defendants' position, plaintiff does not deny that he smuggled a pepper out

of the dining hall concealed in the front of his pants. He nonetheless contends that his punishment

for what he characterizes as a "minor rule violation" of a "minor institutional rule" - that is, the

shortest suspension from the Common Fare program permissible under VDOC - was an

overblown reaction and was "part of a common scheme to conspire to remove him and the others

from the Common Fare diet to save money." Plf. Mem. at 7 - 8. Aside from his own conclusory

allegation, plaintiff offers no proof whatever to corroborate this theory, and his "wholly

speculative assertions" accordingly create no genuine issue of material fact which would preclude

the entry of summary judgment for defendants. Cf. Ross, 759 F.2d at 364. As there are no

material facts genuinely in dispute and the evidence as a whole could not lead a rational fact

finder to rule for the plaintiff, defendants are entitled to the summary judgment they seek on

plaintiff's RLUIPA claim. Matsushita, 475 U.S. at 587.

3. Plaintiff's First Amendment Claim Fails

Plaintiff's claim that his six-month suspension from the Common Fare program violated

his rights under the First Amendment fares no better. The First Amendment protects an

individual's right to the free exercise of religion. U.S. Const. amend I. Although incarcerated, a

prisoner still "retains those First Amendment rights that are not inconsistent with his status as a

prisoner or with the legitimate penological objectives of the corrections system." Pell, 417 U.S. at

822. However, as with a claim arising under RLUIPA, a prisoner asserting a First Amendment free exercise claim must demonstrate that defendant's conduct has substantially burdened his religious exercise. Whitehouse v. Johnson, 2011 WL 5843622 (E.D. Va. Nov. 18, 2011) at *5. Moreover, the "First Amendment affords less protection to inmates' free exercise rights that does RLUIPA." Lovelace, 472 F.3d at 199-200; see also, Lord Versatile v. Johnson, 2011 WL 5119259 at *4 (E.D. Va. Oct. 27, 2011) ("RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States."). Thus, "[w]here an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well." Van Wyhe v. Reisch, 581 F.3d 639, 657-58 (8th Cir 2009). Accordingly, for the reasons discussed above in connection with plaintiff's RLUIPA claim, defendants are entitled to summary judgment on his free exercise claim as well.

5. Plaintiff's Right to Due Process Was Not Violated

Plaintiff's final argument is that his suspension from the Common Fare program violated his right to procedural due process. To succeed on this claim, plaintiff must establish first that he was denied a liberty interest arising from either the Constitution itself or state laws or policies that is protected by the Due Process Clause. Wilkinson v. Austin, 545 U.S. 209 (2005). Second, plaintiff must then show that this denial imposed upon him an "atypical and significant hardship ... in relation to the incidents of ordinary prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Third, plaintiff must then demonstrate that the process employed by the state actors was constitutionally inadequate. Wilkinson, 545 U.S. at 220. The adequacy of the procedures employed is assessed by balancing three factors: (1) the private interest affected by the government action; (b) the risk of erroneous deprivation posed by the procedures used and the

14

probable value, if any, of alternate or additional procedures; and (c) the state's interest, including the function involved and the fiscal and administrative burdens of added safeguards. Mathews v. Eldridge, 424 U.S. 319, 335 (1976). This last factor encompasses the state's interest in prison management, particularly in allocating resources and maintaining security, order and discipline. Wolff v. McDonnell, 418 U.S. 539, 556 (1974) (recognizing that there must be "mutual accommodation" between institutional needs and inmates' constitutional protections). Lastly, to recover under § 1983, a plaintiff must show that a defendant acted intentionally to deprive plaintiff of a protected interest; due process protections are not triggered by "the mere failure to take reasonable care," so negligent deprivations are not actionable under § 1983. Daniels v. Williams, 474 U.S. 327, 330-31 (1986); Pink v. Lester, 52 F.3d 73, 75 (4th Cir. 1995).

In this case, it is undisputed that plaintiff has a liberty interest in a religious diet based on his First Amendment right to free exercise. Plaintiff does not argue that the procedures used to suspend him from Common Fare were inadequate; instead, he contends that their application to him was wrong. As described above, after plaintiff smuggled the pepper from the dining hall on September 29, 2013, he was notified in advance that he was to appear at an ICA hearing to determine whether he would be suspended from Common Fare. After the hearing on October 10, 2013, the ICA recommended that plaintiff be suspended from Common Fare for six months. Keeling Aff., Enc. F. In the regular grievance he subsequently filed, plaintiff took the position that his suspension was unlawful because "Rule (2) from the Common Fare agreement states that an offender can be removed or suspended from the Common Fare diet if he is observed trading, or possessing unauthorized food from the MAIN LINE. Clearly, peppers are not from the main line." Keeling Aff., Enc. G. Thus, plaintiff reasoned, his right to due process had been violated because he had received "no notice ... that [his] conduct of being in possession of Common Fare

15

food outside the dining hall would result in [his] being suspended from the Common Fare religious diet." Id. In plaintiff's opinion, "[t]he appropriate remedy for this incident should have resulted in a disciplinary charge for possession of contraband." Id. The warden determined that plaintiff's grievance was unfounded because he admitted to having the pepper inside his pants while departing the dining hall. Keeling Aff., Ex. H.

The Court is unimpressed with plaintiff's attempt to parse the language of the Common Fare Agreement to justify his clearly unlawful conduct and create a constitutional issue. It is apparent from plaintiff's action of concealing the pepper in the front of his pants upon leaving the dinning area that he was aware that his conduct was prohibited by institutional rules. Indeed, he conceded in the disciplinary process that he had committed the disciplinary infraction of possessing contraband. All of the prison officials who considered the matter, from counselor Meyer through the Warden, agreed that plaintiff's action violated the Common Fare Agreement, and nothing plaintiff has presented here demonstrates that these decisions were made arbitrarily or without articulable basis. And even if those decisions were based upon an erroneous interpretation of the Common Fare Agreement, plaintiff offers no evidence whatever to suggest that the error was the result of intentional misconduct rather than mere mistake. Since due process protections are not triggered by mere mistake, no violation of plaintiff's right to due process has been established, and the Court will not interfere with the defendant prison officials' determination that plaintiff's action warranted a temporary suspension from the Common Fare program. Lovelace, 472 F.3d at 200.[5]

---

[5]Defendants also assert qualified immunity with respect to plaintiff's claims. However, because the Court concludes that plaintiff has failed to establish that a violation of his constitutional rights occurred, the issue of qualified immunity need not be addressed. Shabazz, 2013 WL 1098102 at *9 n. 20.

16

## IV. Conclusion

For the foregoing reasons, defendants' Motion for Summary Judgment will be granted, and judgment will be entered in their favor. Plaintiff's Motion Opposing Defendants' Motion for Summary Judgment will be denied. An appropriate Order shall issue.

Entered this _3rd_ day of _MARCH_ 2015.

Alexandria, Virginia

_/s/_
James C. Cacheris
United States District Judge

17